Company. Good morning. My name is Scott Folks on behalf of Appellant ARCO Products Company. I'd like to reserve, if I could, 5 minutes or so for rebuttal. At issue in this appeal is the propriety of a judgment under Section 1981, including a record-setting $5 million punitive damages award. Well, I don't think that's record-setting. You're not even in the law. Well, in the Section 1981 case, yes. Oh, maybe. I was thinking I had a $5 billion. I'm aware of that opinion. I've got a ways to go to get there. A record-setting I'm going to make one suggestion. I think we're all very familiar with the case. You have 20 minutes, and if you could get to the heart of the issues under State Farm, I think it would probably, it would certainly help me. I don't know how the other members of the panel feel. But it seems to me that's a big part of this. I realize you have some other issues. Yes, and I'm not sure I'll address every single issue in the time I have. I don't think the time permits. I'll rest on the briefs on certain issues, but that is the one issue I'd like to highlight as well. Let me start by saying that obviously the plaintiff in this case is Baines, LLC, the corporation doing business as Flying B, not the employees of Flying B. Indeed, after the briefing was completed in this court, the employees of Flying B have filed their own lawsuit in state court seeking to recover for exactly the same alleged conduct at issue here. That lawsuit is, of course, a matter of public record that the court may take judicial notice of. Just for the record, let me state that it's Singh v. Arco Products Company, King County Superior Court, case number 03-2-26809-7. I was curious about this argument, 26809. 26809-7, S-E-A. I think it's an S. It may be an 8-E-A, but I think that's S-E-A. I appreciate being told about it, but I don't see right now that it has any relevance to any of the issues we're deciding. Is it pertinent to anyone? Well, it's illustrative, in my view, of the distinction that we stress in our briefs between the corporate plaintiff that was awarded no actual damages here and the individual employees. But as a technical legal matter, I agree. Corporate plaintiff can have injury under 1981 if there's discrimination against employees of its employees or contractors or people that work for it, lead it to suffer some injury. That's what the Park School case says. The verdict here tells us that the jury thought the corporation suffered some corporate injury, although it put nominal damages at $1. Well. And I don't know what happened, whether the jury thought – we know the jury thought there was a breach of contract and there were hard damages of $50,000 for that. I don't know whether the jury thought it would be duplicating damages to award damages under 1981 or something else was going on. But at least it looks to me like the jury thought there were some corporate damage or a breach of contract and that there was race discrimination. Well, actually, the reasonable inference from the jury's finding of $50,000 in contract damages, the reasonable inference is that they found no actual harm to the corporation under Section 1981 because they would have at least awarded the same $50,000 under Section 1981 pursuant to the court's instruction 20, which told the jury to award double damages. And we presume that the jury did understand the law and followed the law. That follows. Yeah. I've taken it most favorably to you. The $50,000 is for not giving the 30 days' notice. Correct. But the jury could think the corporation suffered harm in that it was unable profitably to perform its contract, were not awarding damages beyond the 30 days' notice because the economic strain of trying to perform the contract makes it insufficiently certain that the company would have made a profit beyond the 30 days. But the 30 days was part of the claim under Section 1981 as well. They terminated the contract on October 30th. They can't give the lost profits for the 30 days twice as compensatory damages. No. In fact, they were instructed to do so in instruction number 20 by the court. The court told them to award double damages and that the court would take that into account later and decide that. I missed that. Where is that? That's jury instruction number 20. Where is it in the excerpt? Oh. Well, that's okay. Yeah. I'll find it and come up with it. It's in the brief. I think we cited that in our brief. You should argue whatever issues you think are in ARCO's interest. And there's three members of this panel. But I'll just tell you, I don't know what the jury was thinking exactly. And I don't know what the judge was thinking with that double damage. I'll take care of it, jury instruction. But I don't think the verdict of nominal damages is consistent with finding liabilities. So I'm, just as one judge, I'm just interested in the punitive damage award. You can argue whatever you want on the other. No. Issues that bother me. We could argue about that for a long time, but I understand. There are legitimate arguments, and they're presented in the briefing, and I'll study them further. But the issues that most intrigue me in this case are we know we have to follow the Supreme Court's ruling in State Farm. We know it addresses issues of, you know, normally not more than single digit multiples of actual damages, when you have actual damages. I don't know if the Supreme Court has told us anything about how to view that principle of ensuring due process when we have a case of nominal damages. I mean, it would seem to me that it couldn't make sense to say, assuming we reject your position that we have to toss out the 1981 claim completely, and I haven't decided on that yet, you know, we'll evaluate it. But assuming that that stands, I don't think it could make sense that punitive damages are limited to $9. No, and that's not our argument. So the question is, what principle informs our judgment, at least the question that intrigues me is, what are the principles that govern the limits on punitive damages after State Farm in a case where the damages are nominal damages? Well, true. The ratio analysis does not apply strictly in a nominal damages case, as you're pointing out. It does apply, couldn't it, to the 50? But the punitive damages were awarded under Section 1981, not on the $50,000 contract claim. You're still looking at what the overall compensatory damage is, what the overall economic loss was. 50 gives you some measure. Yes. Yes. If you look at it as a proxy for damages, we could do some multiple ratio analysis on that. I think you could do the ratio analysis with the 50. There's a precedent from the Supreme Court, first, and second, from the Ninth Circuit, on what the law tells us is to be done when you assess punitive damages against a nominal damage award. The BMW and State Farm case both point out, or at least the BMW case does, that in cases of low compensatory damages, the ratio analysis is a little looser. But you still have to have a reasonable relationship between the actual harm, or the actual or potential harm, and the punitive damages. And so here, the jury found no actual harm, and therefore, you still, I think, have to have some right. That I'm thinking about here, so you can address it.  A judge who has some familiarity with actual cases going to trial and an individual case is not in the same position as an accountant who has no familiarity, say. Somebody who doesn't know anything about cases might have to just say, well, multiply your total compensatories of $50,001 by 10, and you've got your ceiling. But somebody who has some experience and familiarity would say, $5 million is not a lot of money when you're talking about a major corporate defendant. And these are fairly small damages, as these things go, for a major corporate defendant. So the looser rule would apply. Is there any reason we can't do that? I think State Farm does put some limits on the, to the extent that the wealth of the corporation. $5 billion instead of $5 million. Well, but the language of State Farm that says that the wealth of the corporation cannot justify an otherwise unconstitutional punitive damage award. And the Second Circuit has looked at the cases of nominal damages and does have some law on the issue of what do you look at. I'm curious what they say. I mean, it seems to me that after State Farm, and I don't want to prejudge this before hearing all the argument, but it just seems like after State Farm saying that double digits would be rare against actual damages, that it couldn't be justified to have $5 million times a nominal $1 damage. No, and that's, again, that's not what we're arguing. The Second Circuit in the case of Lee v. Edwards and some cases that have come down since Lee v. Edwards, which is cited in our brief, has said that you look to the other two prongs or guideposts and the comparable civil penalties to a greater degree than you do when you look at the reasonable relationship test of the second guidepost. So the Second Circuit has addressed those in the cases involving nominal damages and typically has awarded punitives between $25,000 and $100,000. Are you solely to those other issues or do you still consider the damages? I don't think the Court in the Second Circuit cases has said you don't discount the second, you don't count the second guidepost at all. I still think there has to be some, it goes to the fair notice point, there has to be some reasonable relationship between the harm or the potential harm and the amount of punitive damages. Why can't we look at the $50,000 the jury awarded as a concrete amount of damage on the contract, at least as one factor that we consider in trying to determine what's a reasonable punitive damage award? Well, this gets back to the point we talked about at the very beginning, which is that the $50,000 was not awarded for discrimination. I understand that. Okay. There's another issue of theoretical interest to me that I don't fully understand. That is, what is the, what are the legal parameters or precedent relating to the kind of potential? When you say you can, that we can consider actual and potential harm, what is the potential harm? What do the cases say that means as potential harm? You're talking about harm that was asserted by the plaintiffs, but the jury rejected it? Or are we talking about harm to third parties? The State Farm case, that is one area where the State Farm case went, I think, beyond BMW. And the State Farm case said that you do not look to the hypothetical claims or harm to others. You look to the harm of the plaintiff, to the actual or potential harm to the plaintiff. And it dates back to the TXO case, which talked about schemes that were interrupted prior to completion. That's not an issue here in our case. You look at the harm, the actual or potential harm to the plaintiff. Correct. If the plaintiff puts on a damage expert, a direct judge, the district court, he's going to equate potential harm with the damage testimony of the plaintiffs. And that's where, that's one of the reasons why we think the trial court erred, because that's putting the plaintiffs in the same position had they been, had they actually been awarded the damages by the jury. I have trouble following that reasoning. But if potential harm to the plaintiffs doesn't mean their damage theory that was rejected by the jury, or that at least wasn't awarded by the jury, then what is the potential harm to the plaintiffs? I think it goes back to the origin of the potential harm concept from the TXO case, where the scheme was interrupted prior to completion. And in that case, the court said, well, had your scheme been successful, you would have damaged the plaintiff by $5 or $6 million had you not been interrupted, or shooting a gun into a crowd. I don't see why you can't consider the 50. It seems to me that the 50 is for breach of contract. And the whole gist of the case is that this contract fell apart because of racial discrimination. So even though it's not under the 1981 count, it would be a – that's just because the jury thought this would be a breach even if there was no racial aspect to it at all. But it doesn't mean that the breach had nothing to do with any racial aspect. It just means that the plaintiffs proved their entitlement to the $50,000. They more than proved it. So I don't see why you can't use the 50 rather than the dollar and why we're not limited by the $1 in compensatory. Well, I don't necessarily want to talk the court out of using $50,000 and multiplying it by the maximum ratio that the Supreme Court has said is permissible or the 4 to – well, no. Ratio permissible. They carefully put in some weasel words. Yes. 4 to 1 is close to the line. And 9, you know, anything above double digits is close to – I can't remember the exact – They tell you when your eyebrows are supposed to be raised. They don't tell you what your ceiling is. Yes. And everyone was hoping State Farm would be a little bit more precise, or some people were. But fortunately – Mr. – folks, I think I got lost as a result of the question that Judge Kleinfeld asked. And I wasn't sure if I finished answering. But we were talking about the plaintiff's original theory, which was damages of $550,000, and that that's what Judge Zille was looking at when he evaluated the reasonableness of the $5 million in punitive damages. Is that correct? That was part of what he looked at. He also looked at the potential harm to others, which, of course, State Farm says you shouldn't do. But, yes, he did look – he did consider $550,000 to be the potential harm, even though the jury found that there was no harm of $550,000. And then – I'm sorry. Go ahead. No, I bet that's fine. You're saying that his conception of potential harm is wrong. Potential harm isn't the evidence you presented that the jury rejected, the $500,000. Potential harm is like if something gets stopped in midstream and the harm isn't realized. Yes, or the hypothetical of shooting a gun into a crowd. So it's like some unrealized damage. That was part of the reason he erred with the potential harm. The other thing he did was he looked at the potential harm to others. State Farm has ruled that out. Yes. According to your position. Yes, and the California Appellate Court recently released an interesting opinion on punitive damages in light of State Farm just last week. What are the factors here? Discussing that issue. Do you think it's a finding of discrimination and unreprehensible? And on that, I think Judge Zille erred in that he focused on the conduct of Bill Davis, the non-managerial employee, more than the conduct of ARCO. Right. I would say the position in your brief and Judge Zille's opinion are like ships passing in the night almost. You know, he's quite much more impressed with Mr. Davis' supervisory responsibility over filling up the tankers, and you're arguing that Mr. Davis didn't have the power to hire and fire people. Under the Brooks case. So he really wasn't a supervisor in a legal sense. And, in fact, the plaintiffs, the appellees in their briefs have now conceded that Bill Davis was not a manager. What do we care? The case went to a jury. The jury decided it. The jury could have decided that the racist at the pumps is really running that facility, even though he's an independent contractor, consultant-type employee. They used him to run the facility. He's a supervisor for ARCO. No, we care because the de novo review that is done on the punitive damages and on the reprehensibility looks at the evidence. The jury does not make a determination under BMW as to reprehensibility, and also it's the actual authority. They do. They're supposed to be instructed to. We review it, but the jury gets to decide, and we can't take all the facts most favorably to the unsuccessful defendant. No, and I don't think we're arguing that. Under BMW and State Farm, we have a more or less de novo review of the issues of reprehensibility. I agree with that, and I say we want to look at the conduct of this. The district court also was impressed that there were discussions with, I guess, was it Mr. Lawrence? Yes, Al Lawrence. Who is the manager. Correct. And there's no question that he was a supervisor. So if he had malice, there's no question that would support some punitive damage award. Yes, and the record as we put in the brief shows that Al Lawrence may have been negligent at best, but he went and spoke to Mr. Davis, and that's uncontradicted in the record. I think Davis himself testified that it wasn't just him who was making racist remarks. Everybody made racist remarks. Everybody knew about the racist remarks. Everybody knew that he had made racist remarks. That was Davis' testimony. Davis never said that Al Lawrence had made racist remarks. And, in fact, the plaintiff's owners all testified that only Bill Davis did, didn't he? Pardon me? He said that everybody at the facility did generally, and Lawrence knew he did, didn't he? He said that he testified his testimony was contradicted on this issue, but yes. It was contradicted. But since we take the evidence most favorably to the party that prevailed in the jury trial, don't we have to proceed on the basis that what Davis said was true? The most favorable evidence to the plaintiff is that he used the term, the racist terms in front of Al Lawrence on maybe, excuse me, probably more than once and maybe more than five times. Okay. After which Al Lawrence went and talked, after the complaints from the owners to Al Lawrence, Al Lawrence went and talked. Didn't get rid of him. Maybe talked to him. He talked to him and then never heard any further complaints. Several times. Lawrence heard him make these racist remarks. And then talked. Then he spoke. Then he spoke to Mr. Davis, told him to stop. I want to be corrected here if I'm misunderstanding. He might not have stopped, but Mr. Lawrence never heard any more complaints. I thought the testimony was that Lawrence said that the racial epithet was used five times. Not that he had five conversations in which it was used. Mr. Davis testified that he used, he was asked, have you ever used the terms in front of Mr. Lawrence? He testified, the time he testified in giving the plaintiff, you know, he switched his testimony, but he testified he used it probably more than once and maybe more than five times in front of Al Lawrence. And then Al Lawrence went and spoke to him after he was, after the complaints. Then Al Lawrence heard no further complaints. So that's the ARCO management. Also, does the record show that the assertion of complaints in this case about racism arose for the first time, in terms of assertion to Mr. Lawrence, arose for the first time after there was an advice to the, to the appellee that their contract was going to be terminated? No, no. I don't think that's, the record is that the complaints were made to Mr. Lawrence while the contract was being performed. And that Mr. Lawrence then went and spoke to Mr. Davis, told him not to do it again. And then Mr. Lawrence heard no further complaints. So from the view of ARCO management, the problem was, had been taken care of. Okay. But I want to make sure I'm clear. I understood the record to indicate that Lawrence heard four reports of Davis's racial harassment. That's right. In the light most favorable to the plaintiffs. I agree with that. And then after the fourth one, he spoke to Davis. Well, Judge Palmer, the record isn't clear on the timing as to when the complaints took place relative to Mr. Lawrence's discussion with Mr. Davis. Okay. The record is just not clear on that. All right. But viewing the evidence in the light most favorable, there was evidence from which the jury could conclude that a senior manager of ARCO, the terminal manager, Mr. Lawrence, was aware of the problem and failed to take adequate steps to address it. I agree with the first part of that, not the second part. I understand. Because the record is undisputed that Mr. Lawrence went and talked to Mr. Davis, number one. And number two, after he talked to Mr. Davis, he heard no further complaints. Okay. Was there further evidence at trial that continued harassment occurred? There was test – well, again, the timing isn't clear as to whether the harassment occurred after the fourth complaint to Mr. – unfortunately, the record's a little bit vague on the timing. The record could be taken by the jury to mean that there was racial harassment that continued after Lawrence talked to Davis. Yes, but not that Mr. Lawrence was aware of that. I agree. Okay. And that's the key from our point of view, that ARCO management's awareness is what you need to look at. So what it means is that just talking to Davis wasn't – was not adequate, according to the jury, because it didn't stop it. It didn't stop. But, again, we're focusing on, for the point of punitive damages, on the conduct of ARCO management. So Mr. Lawrence's conduct – But if it didn't stop, doesn't that – if the jury found that it didn't stop, that whatever he said to Davis wasn't good enough, doesn't that support punitive damages? I'm sorry. How was Mr. Lawrence to know that there were any further problems if he wasn't getting the further – Well, one way to eliminate the problem is eliminate Mr. Davis. That solves that problem. Well – As I understand ARCO's argument on this, they're saying Lawrence talked to Davis and said, stop it, and – or, you know, in substance. And after that, Lawrence didn't hear that Davis hadn't stopped it. Correct. And then their position is only Lawrence is a manager, as between Lawrence and Davis. Correct. And unless Lawrence did something malicious, there can't be any award of punitive damages. That's right. That's what you're presuming. So the jury may have found that Lawrence didn't do enough, that he should have fired Mr. Davis, but that's under Nago and the leading cases. That's not enough. I'm just going to be close on that, whether there's adequate evidence that Lawrence's inaction shows malice. But I want to hear from the attorney's lawyer argument on that also. I think we're over time, unless my colleagues have further questions. Let me just check if there's one other. Let me just confirm this. On the issue of potential harm, what we should consider potential harm, you're suggesting the TXO case is a good case? That's a case that goes into an extensive discussion of potential harm. Okay. And on the issue of how to treat a relationship between nominal damages and punitive damages, you're suggesting the Second Circuit's opinions address that explicitly? You have Lee v. Edwards and cases since Lee v. Edwards. Is there any other circuit? I might have some sites I could give you. Are there any other circuits? I don't think the Ninth Circuit has addressed that as far as I know. No, not that we were able to find. Okay. So is there any circuit other than the Second Circuit that specifically looked at what you do when you have punitive damages and nominal damages? Not that we were able to find. I do think, however, the BMW analysis still holds. You still have to have a reasonable relationship. But as far as your specific question, the Second Circuit cases are the closest that actually do discuss this issue, and they say look to the other two prongs. The general rules have been stated in BMW and State Farm, but you're saying there's no specific application of that at the circuit level to the question of nominal damages except in the Second Circuit? That's right. I want to check my notes to make sure there wasn't some other. The Second Circuit really goes into this specifically. No detailed analysis of it? No, no, they do. They say that when nominal damages case ñ I don't have any detailed analysis of that issue apart from the Second Circuit. I'll check my notes, and I want to stand up in rebuttal and give the ñ If you have a circuit that goes a different slant from the Second Circuit, it would be helpful for us to know it, you know, so that we can ñ we have to figure out what makes sense for the next. If I find further authority, do I have leave to submit something to the Court on that issue? I don't want to write another brief, that's for sure, but ñ You can submit a 28-J letter. You're way over time. Don't count on a rebuttal. All right. I wanted to give you the site to the ñ Counsel, let's stop. Sorry. As far as further briefing goes, if we want it, we'll ask for it. As far as your rights to submit 28-J letters, follow the rules. Thank you, Your Honor. Thank you, counsel. Counsel. Can it please the Court? My name is Eric Hyde. This is my partner, Ed Budge. We represent Flying Bee. Counsel, help me on what troubles me most in this case. My tentative inclination is to think that we can use the 50 as a predicate for the punitives, and it's fairly easy to affirm punitives, even though there are arguments at each step of the way, up to somewhere between 300 and 500. After the 300 to $500,000 range, it really gets kind of tricky in light of BMW and State Farm. Help me with whatever justifications there are for going from the 500 to the 5 million. You have to consider potential harm, and potential harm by definition is not the amount the jury awarded. It's the amount of harm that was likely to occur from the perspective of the wrongdoer at the time of the wrongdoing. At the time of a wrongdoing, ARCO did not know how much the jury was going to award. What it did know was that its conduct was potentially ruinous to Flying Bee. This was a very, very lucrative contract. It was grown from day one to the very last day. ARCO management was told that the result of terminating this contract without notice would result in Flying Bee having to lay off its entire workforce, park eight trucks, and that it would cost them substantial money, way beyond $50,000. I have trouble reconciling this with State Farm. The way this argument goes is I look at what Davis is doing and ARCO isn't doing anything about while Flying Bee is performing, and I'm supposed to say, my gosh, anyone could see this could cost Flying Bee a fortune. They've extended themselves to buy all these trucks, and this could drive off their employees and ruin them. But the way I look at State Farm, I'm supposed to look at what harm actually occurred here so that I have some more concrete measure. State Farm was very clear it did not change the existing law. You have to look at actual harm. You also have to look at potential harm. And the question is what is potential harm? It's not as you recognize in the Exxon Valdez case. It's an indeterminate number. It's not an easy number. It can be when you have an illegal scheme that's interrupted prior to completion. It also can be when you fully can ---- Is that the TXO case? Yes, it is. But it's beyond that, both in TXO and BMW and other cases, because ---- You're saying State Farm expressly leaves the door open to consider the potential harm that would be apparent at the time the contract was being performed. Absolutely. Every time this ---- BMW, TXO, Cooper Industries, and State Farm Mutual, every time they lay out the three guideposts, they articulate the second guidepost as the disparity between the punitive award and the actual or potential harm. All of these guideposts go to notice. If they're going to notice, it makes sense to look at the potential consequences of your actions at the time you break the law. It can be if there's an illegal scheme that's interrupted. It can also be if there's an illegal scheme that goes to completion, but it doesn't, for whatever reason, result in a very high compensatory award. There's many examples of this. Can I pose a question to you? It ties in with Judge Kleinfeld's questions, which is something I shared concerns that he's expressed. How can I put this? Okay. Is there any case authority that says potential harm can include the evidence of harm that was submitted to and rejected by a jury? The evidence of harm was not rejected by the jury. The compensatory damages were rejected by the jury. The only time the jury was asked to take actual harm into account was in the punitive damage. I'm not saying there's no harm, but I'm saying it seemed to me that Judge Zille may have gone off the legal trail. I'm not sure. But it seems to me that it can't seem right for him to say the potential harm is the damage evidence that was presented, you know, the $450,000 for the life of the contract that the jury did not award. I'm not getting that as a sensible way to look at potential harm. I'm not sure what potential harm then means. I don't believe that Judge Zille said that potential harm necessarily means the plaintiff's allegations. He didn't say that specifically. He says when he's talking about potential harm, he says, Plaintiff's expert witness on damage testified the company lost approximately $500,000 on the termination. So it looked to me like in assessing the punitive damage, at the end of that very paragraph, he comes back to say that the testimony made it clear that ARCO's conduct had the potential to cause Flying V up to $550,000 in economic damage. So he's like, in black and white, he's saying, as I read it, that in his mind, potential harm is the testimony of damage that was presented by the plaintiff, which we know the jury didn't credit. Am I right that that's what he's saying? He's taking the number that you said that's not what he's saying. I thought you were saying. Could I elaborate on what I was saying and why? I just want to know if that's, yeah, go ahead. I'm sorry, Your Honor. What I was saying merely was Judge Zille was not saying that you automatically do that in every case. It made sense to do it in this particular case. In many cases, the plaintiff may allege that the harm is $10 million. When the judge looks independently of the record and there's not substantial evidence that that was the potential harm, this was it. I wasn't asking did he say do it in every case. I was saying did he say in this case potential harm is the damage testimony that was rejected? At least. I think you're saying he did say that. He said it was. You're saying that's legitimate. Okay. I'm just, and my question was, is there any case authority in any circuit that says that that is what potential harm is? Any case? Well, take the TXO case, for example. The award in that case was $19,000. That was the compensatory award. The punitive award was $10 million. The Supreme Court in that case took evidence from the district court who looked at the record and concluded that the potential harm could have been $4, $5, or $6 million. That isn't answering my question about there the damage hadn't yet occurred. Here the expert said here's what the damage is on the contract. In the Exxon Valdez case, Judge Kleinfeld, when considering the potential harm in a case where the damage has already occurred, looked beyond what the jury awarded and looked to the district court's articulation that the potential harm was a higher amount than was ultimately awarded. It was, well, all we're saying is. I think we looked at a bunch of things and said, whatever we look at, it's too much. I'm just trying to find out if there's any case, and I'm not hearing a case from you, so I assume that there is any case that supports the theory that Judge Zille laid out. There may be some other theory. There may be some analogies, but I'm just looking to know if any case has said that potential harm is what he said here. If the answer is that there's no case, but that's what we should say, okay. I want to get to another question. If you have no case, could you just say no, and I can ask another question? That's fine. No, Your Honor. I have another question I want to ask you, and this is not about a case. It's about a theoretical approach. You know how PI lawyers will look at a case and it's a paraplegic case, and they'll say, well, I'd eyeball it around 2 to 4 million. Brain damage case, they'll say, could go to 5 million. Broken leg, they'll say probably high five, maybe low six figures. I'm thinking, should we do an approach kind of like that? Is that what you're urging, that ARCO should look at it when the manager, when the Baines Company, or rather Flying B Company, is serving its corporate purposes, delivering the fuel, and it's got this racist who's bothering them every time they show up. Should ARCO look at it as of that time, not at the time when the verdict comes in, but as of that time and say, we're looking here at a low seven-figure exposure if we don't nip this in the bud? Because when we look at what could happen to these people if they're driven away, we see all these expensive tanker trucks. We see the way the company is bulked up to meet our needs. We're probably looking at low seven figures. Absolutely. I think that at the time of the wrongdoing, you have to look, the potential, the wrongdoer has to ask, what is the likely result of my misconduct? When you fire someone resulting in an entire workforce getting laid off and having to park their trucks, it's safe to assume there's going to be a very substantial amount of lost profits, and you don't know if that company is going to, in one case, the victim of the discrimination may fully mitigate its loss. In another case, they may not be able to, for whatever reason, prove their damages with sufficient certainty. And there's any number of scenarios. What's important is the potential harm at the time of the unlawful conduct, because that goes to the notice of the wrongdoer of the penalty that the wrongdoer faces. And it was very, very clear in this case, this was not a lone employee losing a $20,000-a-year job. This was an entire company that lost a lucrative contract that was told, if you terminate us without notice, we're going to have to lay off our workforce. We're going to have to park our trucks. This is going to be devastating to us. What was the testimony with regard to the expected duration of this contract? We understand that it was driven by the fact that the Olympic pipeline had exploded, and presumably both parties to the contract understood that there would come a day when the pipeline was reopened and that they would no longer need to ship this fuel by tanker trucks. What evidence was there at trial as to the expected duration of your client's contract at the time it was terminated? I don't believe there was a specific time laid out, but it was expected to – it wasn't expected to be up and running anytime soon. I think it was an indefinite time. Well, your expert must have assumed some period of time in reaching a $550,000 number. He picked the actual time in retrospect. After it reopened? Yes. Which was, what, eight months later? Yes. Okay. The thing is, Flying B had an expectation that went beyond this contract. I mean, ARCO still today hires independent contractors that they've contracted with in the past. We lost more than – by destroying this relationship, it was more than just eight months of damages. So your argument was that they would have been renewed even when the pipeline was reopened? Absolutely. That didn't have anything to do with the damages number that we asked for because legally we weren't entitled to that. But in terms of the harm that ARCO's actions caused Flying B, they not only stopped us from hauling fuel with ARCO during the duration of the time the pipeline was down, but also a future relationship that – That's why, from the record, that once the pipeline was repaired, ARCO would be using the pipeline to get its gas to the mark, to the terminal, that it wouldn't be using these trucks day and night. They wouldn't be using the trucks day and night for the same purpose. ARCO doesn't just haul from northern Washington to Seattle. They haul from Washington to California. They haul all over the place. They use independent carriers beyond just for that route, and the owners testified that they saw this as a stepping stone into future relationships with ARCO, whether you consider it. Was that quantified in terms of estimates of scope of business with ARCO they hoped to have in the future? No. There was no number put on that. And they had not had a previous relationship with ARCO until the pipeline exploded. Correct. Counsel, what you're saying now seems like a stretch to me, and I'm having trouble understanding something about the verdict. There's a dog that didn't bark here, and since you know all about the evidence and I don't, I want you to educate me on it. Here's the way I look at it. The safety justifications that ARCO gave for firing Flying V came out looking foamy. The jury thought the racial harassment was real. They bought it. The jury bought the proposition that it was ARCO's fault. $550,000 for the real eight months that the pipeline was out, as opposed to the very speculative possibility of getting more business after the pipeline was restored, $550,000, it doesn't seem that out of line. How did the jury manage to find against you on the $550,000? How did you lose on that? I don't know what happened there. I think that the records that were presented by the economists, maybe the jury found that that was more speculative than it could have been. We felt it was sufficient. Judge Zille obviously thought it was substantial evidence. But ARCO didn't say we weren't harmed in this case at trial. Were you actively impeached or something? ARCO just challenged his calculations and said the records weren't sufficient to establish any reasonable degree of certainty. Is there strong evidence that actually Flying V wasn't making any money? Its tax returns show they weren't making a profit or something? Absolutely not. Flying V never said we weren't harmed or we weren't making money. They merely attacked the presentation by our expert and said the law says you have to present this with reasonable certainty. Did your evidence contradict? I wondered about a different slant on this, and that is, if the $50,000 actual damages on the contract claim are like a proxy for you didn't give 30 days notice to terminate, one might wonder if the jury thought that ARCO was entitled to terminate over the lack of complete vetting and complete insurance. Wasn't there an issue that the company had $2 million of insurance rather than some $5 million standard or something like that? Was there some issue raised about that? There was an issue raised about that at trial. Did the clients present any evidence that they could have satisfied a higher insurance limit? Absolutely. Absolutely. The whole question of vetting, just to make sure everyone understands it, is at some point either just before or during the contract, ARCO was purchased by British Petroleum. British Petroleum had some sort of higher insurance requirements than ARCO had and wanted all the carriers to become vetted, in other words, meet those higher requirements. So ARCO sent notice to every independent carrier on the route except Flying B saying you have to meet these requirements and go ahead and keep hauling for 30 days while you're doing that. We never got that notice. What was the record show as to why they didn't send it to Flying B? Was that some snafu? Their evidence was that it slipped through the cracks. That sounds pretty logical because if they were being hostile at that point, they could have just found a way to terminate the thing rather than keep it going and not give notice about we need more insurance. Whatever it was, in any event, they didn't give us the same 30 days to get the insurance that they did everybody else. Did the clients testify that they could come up with the insurance through their insurance broker or whatever? Absolutely. Absolutely. Unequivocally. I want to address a few corrections in the record. The evidence for imputing punitive liability in this case was more than substantial under both Swinton and Kolstad and any other cases that have come down, regardless of whether Bill Davis was a high enough level of a manager. Swinton, and I know you're near your end of your time, but I'm assuming Judge Kleinfeld will permit you to go over since I'm asking you a question in particular. But Swinton preceded State Farm. Swinton's a very well-reasoned opinion, but it came down before State Farm. It awards a million dollars or so. It upholds a million bucks, maybe punitives, against 30,000 actual damages, if I recall correctly. But it doesn't do the analysis that State Farm called for because State Farm wasn't around. So I ask the question whether Swinton remains a viable precedent. State Farm did not change BMW at all for purposes of this case. State Farm only the only distinction at all was when you have a state case and the jury is instructed to consider or they're allowed to consider dissimilar conduct in other states that might be lawful. The basic BMW holding that the Swinton court applied was not changed at all by State Farm. But State Farm said, had things to say about multiples of actual damages that weren't said in BMW. It's really not any different if you read the two cases. The only thing that it might have clarified a little bit doesn't apply here because it said or it does apply here in a sense because it said when you have a very high compensatory award that already has a deterrent component in it, then a lower ratio is appropriate so that you don't have over-deterrence. That's clearly not the case here. But what I was referring to was Swinton was not the size of the punitive award, but was the availability of punitive damages. And I just wanted to make sure the court understood that the harassment by Bill Davis was reported on four separate occasions to ARCO management. Nothing was ever done. There was no investigation, no discipline. He asked Bill Davis in one conversation, at least ARCO claimed. I don't know that the jury bought it, but Al Lawrence sat down with Bill Davis at one point and said, did you ever use the term raghead? The reports that Al Lawrence went so far beyond just the use of the term raghead. They included being made to use inferior fuel pumping equipment, waiting longer lines. We've read all that. Yeah. Also, Al Lawrence terminated Flying B. So he was a manager that ended the contract. There was also an executive at ARCO's Los Angeles headquarters that was asked to look into the discrimination the day Flying B. was terminated, and he refused to do it. And a very detailed report was made to him. So there was more than sufficient evidence to impute punitive liability to ARCO. Thank you, counsel. Baines v. ARCO is submitted. We are adjourned. Nicely presented. Yeah, thank you. Yes, thank you both very much. Very helpful. Very helpful. We are adjourned until 930. All rise. This court will discuss and stand adjourned. Thank you.
judges: Kleinfeld, Gould, Tallman